UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERNEY GARIBAY,

    Petitioner,

    v.

R. HOREL, warden,

    Respondent.

No. C 09-2828 MHP (pr)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

Erney Garibay filed this pro se action for writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge prison officials' decision to validate him as a gang associate and place him in administrative segregation. This matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

A.   Procedural History

Garibay is in prison serving a 10-year sentence following his 2006 convictions of manufacturing a controlled substance, inflicting corporal injury on a spouse, and child endangerment, with a sentence enhancement for firearm possession. His habeas petition does not challenge that conviction, but instead challenges a decision by prison officials on or about May 22, 2007 to validate him as a gang associate with the result that he was placed in administrative segregation indefinitely.

Before filing his petition in this court, Garibay had filed unsuccessful petitions in state

courts, including the California Supreme Court. The Del Norte County Superior Court denied Garibay's petition "because Petitioner has failed to establish sufficient grounds or circumstances upon which relief may be granted. [¶] Sufficient evidence supported the administrative decision. No abuse of administrative discretion is shown." Resp. Ex. R. The California Court of Appeal and the California Supreme Court summarily denied Garibay's petitions. Resp. Exs. U-V.

In his federal habeas petition, Garibay alleged three claims. The court dismissed two of the claims and found cognizable his due process claim that the evidence used to validate him as a gang associate was unreliable and insufficient. The court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer and petitioner filed a traverse. The action is now ready for a decision on the merits.

B.   The Gang Validation Proceedings

On or about May 22, 2007, Garibay was validated as an associate of the EME prison gang while he was housed at North Kern State Prison. The validation was based on six items which investigators believed demonstrated that Garibay was involved in activity on behalf of the EME and was associated with EME members and associates. Garibay received copies of five of the items and a confidential information disclosure report for the sixth item. The sixth item had been deemed confidential because it contained material which, if known, would jeopardize the safety of individuals and the prison.

A gang validation/rejection review form was prepared for Garibay and reviewed by special agent Foster of the Special Services Unit. This form, dated May 22, 2007, stated that a gang validation package was received with six source materials, and that the six items described below met the requirements for validating the inmate as a gang affiliate. Resp. Ex. B. The form also stated that, pursuant to the validation requirements in 15 Cal. Code Regs. § 3378, Garibay was validated as an associate of the Mexican Mafia (EME) prison gang.

The following six items were relied upon to determine that Garibay met the criteria for validation as a gang associate:

(1) A CDC-128b (i.e., prison parlance for a memorandum) dated December 14,

2

2006, written by investigative services unit ("ISU") agent J. Wescott. Resp. Ex. C. The CDC-128b reported on intercepted mail that was indicative of Garibay's association with members/associates of the EME. The letter was an outgoing letter sent by inmate Rodenbusch, who was housed in ad-seg and for whom EME validation proceedings were pending. To surreptitiously communicate with an inmate in another facility, Rodenbush had addressed the letter to a fictitious outside address and listed the sender on the envelope as inmate Grande, so that, when it was returned as undeliverable to the fictitious address, the envelope would be returned to Grande as the listed sender. Inmates Grande and Garibay were housed in Facility A, whereas Rodenbusch was housed in ad-seg. Prison investigators decoded some of the cryptic references in the letter and interpreted the letter. For example, references to "my four leaf friend" and "greenflower" were interpreted to be references to Garibay, whose nickname was "Clover;" a reference to "C.D.s" was interpreted to be a reference to money; and directions to divide the "C.D.s" were interpreted to be directions for dividing the prison drug profits. As interpreted by the prison investigator, Rodenbusch's letter indicated that he had successfully communicated with Garibay regarding EME activities and what was expected of Garibay to further the EME activities at Kern Valley's facility A. As interpreted by the prison investigator, the letter also provided instructions for Grande as well as Garibay about the distribution of drug profits, including that a certain portion was to be sent to "Old Girl," a/k/a Yolanda "Yoli" Carlos, who was the wife of a validated member of the EME.

(2) A CDC-128b dated December 15, 2006 also written by ISU agent Wescott that discussed a second outgoing letter from Rodenbusch to a fictitious address and listed inmate Grande as the sender so the letter eventually would make it to inmate Grande. Resp. Ex. D. The letter was interpreted as providing information also intended for Garibay. As interpreted, the letter instructed Garibay and Grande to send part of the proceeds from drug sales on facility A to an EME member and his wife to further EME activities, and then to send the rest of the money to Rodenbusch for taxes owed to validated EME members and associates in ad-seg.

3

(3) A CDC-128b dated November 15, 2006 written by correctional officer H. Gonzales, who wrote that, while escorting Rodenbusch in the prison, he overheard Rodenbusch say to inmate Shores, "'tell my four leaf friend that I will be getting at him.'" Resp. Ex. E. Correctional officer Gonzales reported but did not interpret the message. The Institutional Gang Investigations ("IGI") agent reviewing Garibay's case interpreted the comment to be a message from Rodenbusch to the inmate to tell Garibay – whose nickname was Clover and who was housed in the same facility as the inmate to whom the comment was made – that Rodenbusch will be sending him a message. Resp. Ex. N. The IGI agent also interpreted the comment to mean that the message would be about "EME activities and what is expected of 'S' to further the EME activities on Facility 'A.'" Resp. Ex. N. (While that may be the expected content of the message to be sent, the assertion as to content is speculative.)

(4) A CDC-128b dated January 16, 2007 written by ISU agent Thomas that describes and interprets the contents of a recorded telephone call placed on December 10, 2006 by Garibay. Resp. Ex. F  Garibay made the phone call from prison to parolee Mendoza, who then set up a three-way call with Sally Rodriguez, a/k/a "Big Squirrel." As decoded and interpreted by agent Thomas, the parolee and Garibay discussed inmate Filo (who was a validated EME associate in ad-seg), as well as business dealings for the EME inside North Kern prison and on the street. As interpreted, Garibay advised parolee Mendoza to speak with Big Squirrel in person so they could set up business dealings for the EME.

(5) A CDC-128b dated January 17, 2007 written by ISU agent Thomas that describes and interprets the contents of a recorded telephone call placed on October 22, 2006 to the same telephone number to which the December 10, 2006 call discussed in the preceding paragraph was made. Resp. Ex. G. The October 22 telephone call was between Garibay, parolee Mendoza, Big Squirrel and Rodenbusch. As interpreted by agent Thomas, Rodenbusch and Garibay were discussing with the outsiders the narcotics trafficking into the North Kern prison. Mendoza also set up a three-way call to Rodriguez and they spoke about Yoli, the wife of a validated EME member. Garibay then handed the telephone to

4

1 Rodenbusch, who discussed EME activity relayed from an EME member at Pelican Bay and
2 told Rodriguez that the information was very important because it was coming from Carlos, a
3 very influential EME member.

4 (6) Three kites (prison parlance for inmate notes) discovered by investigators in
5 Garibay's personal property and memorialized in a CDC-128b dated January 17, 2007.
6 See Resp. Ex. H. Copies of the kites were not shown to Garibay; he received only a
7 confidential information disclosure report for these items that had been deemed confidential
8 because they contained material which, if known, would jeopardize the safety of individuals
9 and the prison. The confidential information disclosure report notified Garibay that the kites
10 had been recovered and indicated their significance in relation to EME activities. The kites
11 had the "names, CDC #s, monikers and gang sets of numerous active Southern Hispanic
12 disruptive group members/associates on Facility 'A'" including two inmates who were
13 awaiting EME validation. Id. The IGI reviewer wrote that Garibay's possession of the kites
14 "shows that [he] is keeping a log of all the active Southern Hispanics who are loyal to the
15 EME and their illegal activities at NKSP," and that Garibay "is placing himself in a position
16 of leadership for the Surenos and for the EME." Resp. Ex. N at 2.

17 The six items used for validation purposes had been reviewed with Garibay on or
18 about January 25, 2007 by institutional gang investigations agent M. West. See Resp. Ex. O.
19 According to West's memorandum, he conducted an interview "to allow inmate Garibay the
20 opportunity to dispute the validation points being used against him during the validation
21 process." Id. Garibay provided to West a handwritten two-sided document "with rebuttal
22 statements for all source document used as validation points against him for association with
23 the Mexican Mafia (EME) prison gang." Id. West read the rebuttal statements and "asked
24 inmate Garibay if he had any additional information and/or any other statements to add to his
25 rebuttal. Inmate Garibay indicated he did not." Id. At the conclusion of the interview,
26 Garibay "was informed that all of the information he (Garibay) provided would be
27 documented and forwarded to the LEIU." Id.
28 Garibay attended an institutional classification committee ("ICC") hearing on June 7,

5

2007 at North Kern. The ICC memo stated that Garibay was an active participant in the committee's actions. The ICC acted to impose an indeterminate SHU term due to his gang validation, and that Garibay was to remain in ad-seg at North Kern pending "CSR" review and transfer to a SHU. See Resp. Ex. I. On June 19, 2007, a classification staff representative endorsed Garibay for transfer to Pelican Bay State Prison and an indeterminate SHU term. Resp. Ex. J. The classification staff representative noted that Garibay had "proven to be a threat to the security of the institution by his association with a prison gang engaged in a criminal conspiracy against the safety of others," and noted the gang validation documents. Id.

Garibay remained in North Kern's ad-seg unit until he was transferred to Pelican Bay on December 18, 2007, and placed in the SHU on January 17, 2008.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at a prison in Del Norte County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C § 2254(b), (c). The parties do not dispute that the state judicial remedies were exhausted for the claim in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits

6

in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

A.  No "Clearly Established Federal Law" From The Supreme Court On The Claimed Right

In a case governed by 28 U.S.C. § 2254(d), the first – and often dispositive – step is identifying out the governing law. Although the normal search for the law may be wide-ranging, §2254(d) places strict limits on that search by limiting the source to "clearly established Federal law, as determined by the Supreme Court of the United States."  "Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412; Norris v. Morgan, 622 F.3d

7

1276, 1285 (9th Cir. 2010). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. Carey v. Musladin, 549 U.S. 70, 77 (2006).

  The Supreme Court holdings on prisoners' rights in administrative segregation placement decisions are quite limited and are most recently found in Sandin v. Conner, 515 U.S. 472 (1995), which set out the criteria for determining whether there is a protected liberty interest, and Wilkinson v. Austin, 545 U.S. 209 (2005), which both held that an indefinite placement in a harsh ad-seg unit deprived inmates of a protected liberty interest and summarized the procedural protections that already had been determined to exist by the Supreme Court for such a deprivation.

  The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects individuals against governmental deprivations of life, liberty or property without due process of law. Changes in conditions of confinement for a prison inmate may amount to a deprivation of a constitutionally protected liberty interest, provided that the liberty interest in question is one of real substance. Sandin v. Conner, 515 U.S. at 477-87. Interests that are procedurally protected by the Due Process Clause may arise from two sources: the Due Process Clause itself and laws of the states. See Meachum v. Fano, 427 U.S. 215, 223-27 (1976). In the prison context, these interests are generally ones pertaining to liberty. Changes in conditions so severe as to affect the sentence imposed in an unexpected manner implicate the Due Process Clause itself, whether or not they are authorized by state law. See Sandin, 515 U.S. at 484 (citing Vitek v. Jones, 445 U.S. 480, 493 (1980) (transfer to mental hospital), and Washington v. Harper, 494 U.S. 210, 221-22 (1990) (involuntary administration of psychotropic drugs)). Deprivations that are less severe or more closely related to the expected terms of confinement may also amount to deprivations of a procedurally protected liberty interest, provided that state statutes or regulations narrowly restrict the power of prison officials to impose the deprivation and that the liberty in question is one of "real substance." See id. at 477-87. An interest of "real substance" generally will

8

1 be limited to freedom from restraint that imposes "atypical and significant hardship on the
2 inmate in relation to the ordinary incidents of prison life" or "will inevitably affect the
3 duration of [a] sentence," Id. at 484, 487.  The Supreme Court later held that indefinite
4 placement in a restrictive "supermax" facility, where inmates are not eligible for parole
5 consideration, imposes an "atypical and significant hardship within the correctional context."
6 See Wilkinson, 545 U.S. at 223-25

When placement in ad-seg implicates a protected liberty interest, the next step is to determine what process is due.  In Wilkinson, the Court explained that ad-seg placement was not the same as parole revocation or revocation of good time credits, so that the "more formal, adversary type procedures" in Wolff v. McDonnell, 418 U.S. 539 (1974), and Morrissey v. Brewer, 408 U.S. 480, 489 (1972), are "not useful." Wilkinson, 545 U.S. at 228. "Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in [Greenholtz v. Inmates of Neb. Penal and Correctional Complex, 442 U.S. 1, 15 (1979), and Hewitt v. Helms, 459 U.S. 460 (1983)], provide the appropriate model." Wilkinson, 545 U.S. at 228-29.  In Greenholtz, the Court had determined that the level of process due in parole suitability decision included an opportunity to be heard and notice of any adverse decision; in Hewitt, the Court had determined that the level of process due for inmates being transferred to ad-seg included some notice of the charges and an opportunity to be heard.   Wilkinson, 545 U.S. at 229.  "[T]hese cases remain instructive for their discussion of the appropriate level of procedural safeguards." Id.  The Court thus upheld the state's policy in Wilkinson that provided "informal, nonadversary procedures comparable to those [it] upheld in Greenholtz and Hewitt," and found "no further procedural modifications are necessary in order to satisfy due process under" the test in Mathews v. Eldridge, 424 U.S. 319 (1976).  Wilkinson, 545 U.S. at 229.  To summarize, the "clearly established federal law" for purposes of § 2254(d) requires that an inmate being transferred to ad-seg that amounts to an atypical and significant hardship must be provided with (1) notice of the charges or reasons ad-seg placement is being considered, (2) an

9

United States District Court
For the Northern District of California

1 opportunity to be heard, and (3) notice of any adverse decision such as the decision to place
2 him in ad-seg as a validated gang affiliate.

3 Significantly, the Supreme Court has not held that the procedural protections include
4 any evidentiary sufficiency requirement for the decision to place an inmate in ad-seg. In a
5 prison <u>disciplinary</u> hearing, due process requires that there be an evidentiary basis for the
6 prison officials' decision. See <u>Superintendent v. Hill</u>, 472 U.S. 445, 455 (1985) (standard is
7 met if there is "some evidence" from which the conclusion of the administrative tribunal
8 could be deduced). The Supreme Court has not extended <u>Superintendent v. Hill</u> to the ad-
9 seg placement context. <u>Cf.</u> <u>Swarthout v. Cooke</u>, 131 S. Ct. 859, 862 (2011) (implicitly
10 declining to find, for purposes of § 2254(d) habeas analysis, that constitutional protections
11 required for parole denial included any evidentiary sufficiency requirement).

12 The Ninth Circuit and district courts within the circuit have applied the "some
13 evidence" standard to an inmate's placement in SHU for gang affiliation. <u>See, e.g.,</u> <u>Bruce v.</u>
14 <u>Ylst</u>, 351 F.3d 1283, 1287-88 (9th Cir. 2003). And some lower courts have imposed a
15 requirement that the evidence relied upon to confine an inmate to the SHU for gang
16 affiliation must have "some indicia of reliability" to satisfy due process requirements. <u>See</u>
17 <u>Madrid v. Gomez</u>, 889 F. Supp. 1146, 1273-74 (N.D. Cal. 1995); <u>see also</u> <u>Toussaint v.</u>
18 <u>McCarthy</u>, 926 F.2d 800, 803 (9th Cir. 1990) (considering accuracy of polygraph results used
19 to support ad-seg placement). However, these lower court authorities cannot support relief
20 in a habeas action to which § 2254(d) applies where there is no Supreme Court holding on
21 point.

22 With the law limited to the Supreme Court's holdings, analysis of Garibay's case is
23 rather simple. First, there is a protected liberty interest at issue. Indefinite placement in
24 California's secure housing units ("SHU") generally renders indeterminately sentenced
25 inmates ineligible for parole consideration and results in those with determinate terms
26 spending the rest of their terms in the SHU. The SHU conditions are severe. <u>See</u> <u>Madrid</u>,
27 889 F. Supp. at 1127-37. Facing years in the extreme conditions of the SHU, California
28 prisoners have a liberty interest in not being placed indefinitely in the SHU. <u>Accord</u>

Wilkinson, 545 U.S. at 224 (necessity of harsh conditions in light of danger that high-risk inmates pose to prison officials and other inmates does not diminish "conclusion that conditions give rise to a liberty interest in their avoidance"). Garibay is serving a determinate 10-year term, rather than an indeterminate life term, so his placement in the SHU will not affect parole suitability decisions. Nonetheless, years in the harsh conditions of the Pelican Bay SHU presents an atypical and significant hardship and therefore amounts to a deprivation of a protected liberty interest.

Second, in light of the absence of Supreme Court authority imposing any evidentiary sufficiency requirement or any requirement for the reliability of evidence, federal habeas relief cannot be granted to Garibay on the basis that the placement decision is based on insufficient evidence or evidence that lacks sufficient indicia of reliability. Garibay's due process claim that challenges only the sufficiency and reliability of the evidence therefore must be denied.

As another jurist has noted, "AEDPA deference can be a bitter pill to swallow. . . In some habeas cases, we must reject what appear to be valid constitutional claims because petitioner's rights have not yet been clearly established by the Supreme Court." Wilson v. Knowles, No. 07-17318, slip op. 4353, 4363 (9th Cir. Apr. 1, 2011) (Kozinski, C.J., dissenting). But defer the court must, and with such deference, relief is foreclosed. Unlike Judge Kosinki's concern in Wilson, however, AEDPA deference will not result in the rejection of an otherwise valid claim here for the reasons discussed in the next section.

B.     There Was Some Evidence To Support The Decision

Even if Superintendent v. Hill did apply to an ad-seg placement decision, Garibay's claim would fail because there was sufficient evidence to support the decision to validate him as a gang affiliate. Six pieces of evidence were used by prison officials to conclude that Garibay met the criteria for validation as an associate of the EME prison gang. The six pieces of evidence – individually and collectively – provided some evidence to support the validation decision. Those items provided evidence that Garibay was implicated in EME gang activity by his own words on the telephone and by other inmates' references to him and

11

his activities. The source items fit within the CDCR's criteria for evidence of association that could be used for validation under the regulation, which provided in May 2007:

> The determination of a gang identification shall reference each independent source item in the inmate/parolee's central file. The sources shall be based on the following criteria: . . .
>
> (C) Written material. Any material or documents evidencing gang affiliation such as the membership or enemy lists, constitutions, organizational structures, codes, training material, etc., of specific gangs. Staff shall articulate why, based on either the explicit or coded content, the written material is reliable evidence of association or membership with the gang. . . .
>
> (G) Association. Information related to the inmate/parolee's association with validated gang affiliates. Information including addresses, names, identities and reasons why such information is indicative of association with a prison gang or disruptive group. . . .
>
> (L) Communications. Documentation of telephone conversations, conversations between inmates, mail, notes, greeting cards, or other communication, including coded messages evidencing gang activity. Staff shall articulate why, based on either the explicit or coded content, the communication is reliable evidence of association or membership with the gang.

15 Cal. Code Regs. § 3378(c)(8). Although evidence of criminal activity may be used to validate an inmate, it is not the only kind of evidence that may be used. See 15 Cal. Code Regs. § 3000 ("gang" defined), § 3378(c) (gang involvement investigation and sources).

Garibay appears to argue that the evidence must show that he particularly posed an immediate threat or endangered institutional security. See Petition, p. 11. In light of the well-recognized danger posed by prison gangs, prison officials properly could determine that, by being involved in gang activities, an inmate does pose a threat and endanger institutional security because prison gangs endanger institutional security. In other words, prison officials did not have to prove that the individual engaged in a criminal act or an act that warranted a disciplinary write-up in order to validate him as a gang member or associate.

The court does not decide anew whether to validate him, but only whether there was some evidence to support the decision reached by prison officials. Here, there was. At least five of the six items showed Garibay's connection to EME activities. Only the comment a guard overheard inmate Rodenbusch make (i.e., item # 3) would be insufficient alone to support the validation. The regulation required at least one of the items "be a direct link to a

12

current or former validated member or associate of the gang," 15 Cal. Code Regs. § 3378(c)(4), and here the state court reasonably could have concluded there were at least two. Although the sender of the correspondence had not yet been validated at the time he sent the two letters, the California court reasonably could have determined that the two letters in which Rodenbusch instructed Garibay to send money to an EME gang member and his wife showed a direct link to an EME member. See Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (when confronted by summary denial in state court, the federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court").  Thus, even if Superintendent v. Hill's some evidence requirement was a constitutionally required procedural protection for ad-seg placement, the California court's rejection of his due process claim would not have been not contrary to or an unreasonable application of Superintendent v. Hill.

A certificate of appealability will not issue. See 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

## CONCLUSION

The petition for writ of habeas corpus is DENIED on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: May 23, 2011

Marilyn Hall Patel
United States District Judge